**BATHAEE DUNNE LLP**
Andrew C. Wolinsky (CA 345965)
awolinsky@bathaeedunne.com
Yavar Bathaee (CA 282388)
yavar@bathaeedunne.com
Bryce W. Talbot (*p.h.v.* forthcoming)
btalbot@bathaeedunne.com
445 Park Avenue, 9th Floor
New York, NY 10022
Tel.: (332) 322-8835

Allison Watson (CA 328596)
awatson@bathaeedunne.com
3420 Bristol Street, Suite 600
Costa Mesa, CA 92626
Tel.: (213) 458-7075

**JANOVE PLLC**
Raphael Janove (CA 361193)
500 7th Ave., 8th Fl.
New York, NY 10018
(646) 347-3940
raphael@janove.law

*Attorneys for Plaintiff and the Proposed Class*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DUSTIN FORET, individually and on behalf of others similarly situated,<br><br>                              Plaintiff,<br>vs.<br><br>ADOBE INC.,<br><br>                    Defendant. | Case No: _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

1.    Plaintiff Dustin Foret, on behalf of himself and all others similarly situated, brings this class action suit for damages and equitable relief against defendant Adobe Inc.

<strong>NATURE OF THE ACTION</strong>

2.    Adobe is a multinational software company that develops and distributes a wide range of digital tools and services used for graphic design, video editing, photography, document management, and web development. Adobe offers these products as part of subscriptions, which require users to pay recurring fees to access the software.

3.    Instead of ensuring that consumers are well informed when signing up for its subscriptions, Adobe uses fine print, optional text boxes, and an intricate web of hyperlinks to obscure essential terms of its subscription plans.

4.    Consumers enroll in Adobe's subscription services directly through its website, where they are required to submit their payment information at the time of sign-up. Once this information has been obtained, Adobe retains it and initiates recurring charges to consumers' payment methods on a monthly or annual basis, depending on the selected plan. By maintaining possession of consumers' billing details, Adobe continues to impose automatic renewal fees without obtaining additional or ongoing consent. Adobe's decision to implement this recurring billing structure relies on consumer confusion to reduce cancellations and increase revenue.

5.    Specifically, Adobe uses deceptive practices, fails to disclose material terms, and obscures and confuses consumers' understanding of its subscriptions in order to lock consumers into expensive, recurring payments that consumers are unable to cancel without substantial difficulty and significant penalties.

6.    For example, Adobe prominently advertises its "annual, billed monthly" ("ABM") subscriptions. But Adobe unfairly obscures the true commitment involved for these subscriptions, and imposes substantial penalties on consumers who attempt to cancel early.

7.    Adobe displays the ABM plan's "monthly" cost during enrollment, but fails to conspicuously disclose the material terms of the ABM subscription, including the length of the commitment and that the subscription automatically renews. Even more egregious, Adobe hides its early termination fee, as well as the amount of that early termination fee, which is 50% of the

remaining monthly payments when a consumer cancels in their first year. Adobe's early termination fee disclosures are buried in small print within the company's website.

8.     In short, reasonable consumers are deceived into believing they are agreeing to a month-to-month plan that can be cancelled at any time, rather what is actually foisted on them by Adobe: cancellation forces Adobe customers to pay a termination fee much larger than the actual cost of the monthly subscription.

9.     Adobe also fails to adequately disclose material terms of its other subscription options.

10.     Adobe has long been aware of consumers' confusion about its subscriptions, especially the ABM subscription and early termination fees. Yet, Adobe has continued its practice of pushing consumers towards the ABM plan while obscuring its terms and fees. This deceptive approach ensures that many consumers are unaware of the full financial commitments they are making.

11.     Adobe imposes early termination fees and complicated cancellation steps to deter users from ending their subscriptions. Consumers attempting to cancel are redirected through numerous pages and notifications that can confuse and frustrate the process of ending a subscription. And while Adobe purports to allow online cancellation of subscriptions, users often need to contact customer support to fully cancel a subscription. During that process, Adobe's customer support agents try to persuade them to stay or offer discounted rates, adding more friction to the cancellation process.

12.     Adobe's misleading and opaque practices in advertising, offering, and enrolling consumers in its subscription plans—along with its deliberate efforts to make cancellation difficult—violate multiple consumer protection laws specifically enacted to prevent this type of harmful conduct.

13.     Finally, Adobe also hides unenforceable dispute resolution provisions in its terms of use in an attempt to escape any liability. These dispute resolution provisions require consumers to participate in a futile informal dispute resolution process and then submit claims to arbitration, with rules specifying that each party must pay an arbitrator fee before the arbitration can advance. But Adobe has no intention of honoring its arbitration agreement and allowing the arbitrations to proceed. Instead, Adobe simply refuses to pay the arbitrator, and as a result arbitration cannot move forward. Finally, when push comes to shove, Adobe claims the right to force all consumers into small claims court for every single dispute.

*Foret v. Adobe Inc.* - Class Action Complaint

14. Plaintiff and other individuals represented by undersigned counsel previously sought to arbitrate their claims against Adobe in JAMS. However, Adobe refused to pay JAMS' filing fee and asserted that Plaintiff's and the other individuals' claims must be resolved in small claims court. Adobe previously has taken the exact same position regarding other individuals, represented by other law firms, who sought to arbitrate claims against Adobe, instead refusing to arbitrate and demanding that these claims be resolved in small claims court.

15. As a result, to the extent that Adobe's dispute resolution provisions in its terms of use might even be enforceable, Adobe has breached its agreement to arbitrate and forfeited its right to arbitrate.

16. Plaintiff brings this action individually and on behalf of all subscribers of any of Adobe's subscriptions who, within the applicable statute of limitations period up to and including the date of judgment in this action, incurred unauthorized fees for their Adobe subscriptions. Plaintiff seeks a declaratory judgment that the small claims provision of Adobe's dispute resolution provision is unenforceable. And based on Adobe's unlawful practices, Plaintiff seeks damages, restitution, declaratory relief, injunctive relief, and reasonable attorneys' fees and costs for violation of California's Automatic Renewal Law ("ARL"), Cal. Bus. & Prof. Code §§ 17600, *et seq.*, Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq.*, False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, *et seq.*, and Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*

## PARTIES

17. Plaintiff Dustin Foret is a natural person and a New York resident. In April 2022, Plaintiff began an ABM subscription to Adobe's Creative Cloud All Apps 100GB plan. In September 2023, Plaintiff cancelled that subscription and paid a termination fee of $84. In July 2025, Plaintiff began a new Lightroom subscription to Adobe's annual, prepaid plan.

18. As a direct result of Adobe's illegal conduct as alleged in this Complaint, Plaintiff suffered economic and actual injury. The facts giving rise to Plaintiff's claims are materially the same as those of the Class he seeks to represent.

19. Defendant Adobe Inc. is a Delaware corporation with its principal place of business at

345 Park Avenue, San Jose, California 95110.

20.     At all times relevant herein Adobe conducted business in the State of California, in the County of Santa Clara, within this judicial district.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a), and under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because the aggregate amount in controversy exceeds $5 million, exclusive of interests and costs; the number of members of the proposed Classes exceeds 100; and many members of the proposed Classes are citizens of different states than Adobe.

22.     The Court has general jurisdiction over Adobe because it is headquartered in San Jose, California.

23.     This Court has personal jurisdiction over Adobe because a substantial portion of the events and conduct giving rise to Plaintiff's claims occurred in California.

24.     Upon information and belief, key figures in Adobe's corporate hierarchy, including Adobe's CEO, Shantanu Narayen, are domiciled in California.

25.     Pursuant to Adobe's Terms of Use, Plaintiff's disputes with Adobe are governed by California law.

26.     Venue is proper pursuant to 28 U.S.C. § 1391 for at least the following reasons: (i) the conduct complained of herein occurred within this judicial district and (ii) Adobe conducted business within this judicial district at all times relevant.

27.     This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

## DIVISIONAL ASSIGNMENT

28.     Assignment to the San Jose Division is proper under Civil Local Rules 3-2(c) and 3-2(e) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred at Adobe's headquarters in Santa Clara County.

## FACTUAL ALLEGATIONS

A.    **Background**

a.    **Subscription-Based Software**

29.    For decades, software was sold to consumers and businesses through perpetual licenses. Under this model, a user paid a one-time fee to acquire the right to use the software indefinitely, subject to the license terms.

30.    Perpetual licenses allowed consumers to continue using the software without additional payments, even if they chose not to upgrade to newer versions. This model gave users stability and predictability in both cost and functionality.

31.    From the 1980s through the early 2000s, perpetual licensing was the dominant method by which consumers accessed productivity, accounting, design, and other software. Software was distributed via physical media such as CDs or DVDs or through downloadable files.

32.    During this time, consumers had clear expectations: once they purchased a license, they could continue using the software version they had paid for, without risk of interruption or forced obsolescence due to pricing changes or feature modifications.

33.    In the early 2000s, improvements in internet infrastructure enabled the rise of web-hosted software platforms. These platforms were often introduced as alternatives to perpetual software, marketed for their convenience and real-time accessibility.

34.    Application Service Providers (ASPs) emerged in this period, offering hosted software access on a subscription basis. While ASPs were not widely adopted by consumers, they helped establish recurring-payment models for software use.

35.    By the late 2000s, some software companies began introducing browser-based or cloud-based products that required users to pay a monthly or annual fee for continued access. These products were no longer purchased in the traditional sense but were effectively rented under ongoing payment terms.

36.    Salesforce, which launched in 1999, was among the first large-scale companies to deliver business software entirely over the internet on a subscription basis. Its early success contributed to the broader adoption of this access-based model.

*Foret v. Adobe Inc.* - Class Action Complaint

37.    As internet-based delivery became more viable, companies began applying the same model to software that had historically been sold to consumers through perpetual licenses. Over time, the subscription model was extended to productivity tools, creative applications, and consumer financial software.

38.    For example, in 2011, Microsoft introduced Office 365, a subscription version of its Office suite. While Office 365 coexisted with perpetual versions for several years, Microsoft gradually shifted its focus to the subscription model and introduced features exclusive to that version.

39.    In 2020, Microsoft rebranded its subscription service as Microsoft 365, reinforcing the move away from perpetual licensing. Microsoft 365 required recurring payments and disabled access when payments ceased, even if the consumer had used the service for years.

40.    Consumers who previously paid a one-time fee to use Word, Excel, and other tools indefinitely were now required to make ongoing payments or lose access entirely. This represented a material change in the nature of the product being offered.

41.    Autodesk, the developer of design and engineering tools such as AutoCAD, similarly transitioned away from perpetual licenses. In 2016, Autodesk announced it would discontinue new perpetual license sales and move exclusively to subscription-based access. Consumers and small businesses who had purchased Autodesk products under the expectation of durable access could no longer purchase new versions outright. Continued use now required recurring payments, and software would become disabled if payment lapsed.

42.    Intuit, the developer of QuickBooks and TurboTax, began promoting its online subscription-based versions over its one-time-purchase desktop versions. Over time, Intuit emphasized cloud-based versions that required consumers to remain subscribed to access their data and features.

43.    In many cases, these transitions were implemented without sufficient transparency or disclosures to consumers about the long-term financial and functional implications of abandoning perpetual licensing.

44.    In several instances, consumers were not provided with a meaningful choice. Companies offered new features, security updates, and integrations only in subscription versions, effectively nudging or forcing users to switch in order to maintain essential functionality.

45.    Some companies also began disabling activation servers or limiting technical support for older perpetual-license versions, making it difficult or impossible for consumers to reinstall or continue using previously purchased software.

46.    These changes resulted in consumers losing access to software unless they agreed to pay recurring fees, regardless of whether they had already purchased and relied on a previous version.

47.    The shift from ownership to access fundamentally altered consumers' rights and expectations, including their ability to budget for and control their use of digital tools. Under the new model, software became a continuing expense rather than a durable good.

48.    Furthermore, terms of use were subject to unilateral modification by the provider, and consumers had limited or no recourse if prices increased or features were removed. These practices deprived consumers of certainty and control over products they had relied on.

49.    The shift also limited competition and consumer choice, as fewer and fewer providers continued offering perpetual-license options, even when consumer demand for them remained high.

50.    By the mid-2020s, subscription-based delivery had become the default model for many major software companies, with perpetual licensing options removed or made commercially impractical through feature disparities or lack of support.

51.    These changes, implemented without adequate transparency or alternatives, raised significant concerns under consumer protection laws, including but not limited to unfair business practices, lack of meaningful disclosure, and depriving consumers of the ability to retain use of products for which they had already paid.

**b.    Automatically-Renewing Software Subscriptions Have Led to Numerous Harms for Consumers When Paired With Deceptive Business Practices.**

52.    The widespread adoption of subscription-based software has led to a number of recurring and well-documented problems for consumers, including difficulties in canceling subscriptions, misleading marketing practices, unexpected charges, and unilateral changes in terms and pricing.

53.    Such strategies are often referred to as "dark patterns." "Dark patterns" refer to user interface designs that deliberately manipulate or mislead consumers into actions they might not

otherwise take, such as failing to cancel subscriptions or subscribing without a correct or full understanding of the terms. These tactics have been recognized by regulators, including the Federal Trade Commission, as unfair or deceptive practices that undermine consumers' ability to make informed decisions.

54.     In 2024, a Federal Trade Commission study found that 81% of surveyed subscription-based websites used design practices that discouraged or delayed cancellation. The study further reported that over two-thirds of these services failed to provide clear deadlines for avoiding unwanted charges. (*FTC study finds 'dark patterns' used by a majority of subscription apps and websites*, TECHCRUNCH, July 10, 2024, available at https://techcrunch.com/2024/07/10/ftc-study-finds-dark-patterns-used-by-a-majority-of-subscription-apps-and-websites/)

55.     And in many cases, consumers are automatically enrolled in recurring billing programs without sufficiently clear disclosures. A 2024 Forbes article reported that 35% of consumers were paying for at least one subscription they did not recall authorizing, and that 67% of consumers would be more likely to subscribe if cancellation was easier. (*The Recurring Problems with Subscription Services*, FORBES, May 7, 2024, available at https://www.forbes.com/sites/nathanpettijohn/2024/05/07/the-recurring-problems-with-subscription-services/).

56.     In surveys reported by P&C Global, 79% of respondents were frustrated by hidden or unexpected fees associated with digital subscriptions, and over half believed they were paying for more services than they intended. (*The Subscription Model Reckoning: Winning Back Trust*, P&C GLOBAL, 2024, available at https://www.pandcglobal.com/research-insights/the-subscription-model-reckoning-winning-back-trust/ ).

57.     Online consumer complaint platforms, including Reddit and ConsumerAffairs, are replete with accounts of individuals who attempted to cancel software subscriptions but continued to be charged, sometimes for months or years. Other consumers report being unable to cancel online at all, with companies requiring that cancellation requests be made over the phone, during limited hours, or through cumbersome verification processes.

58.     Some services have offered "free trials" of software products that automatically convert

to paid subscriptions if not canceled in time. These trials often lack prominent disclosures of conversion dates or are bundled with other services that trigger additional charges.

### c. Consumer Protection Laws for Automatic Renewal Subscriptions.

59.     These practices have prompted regulatory scrutiny and legislative responses. Many states have enacted laws requiring clear and conspicuous disclosures for automatic renewals and mandating simple, accessible cancellation processes. Further, consumer protection laws across the country protect consumers like Plaintiff from such deceptive and unfair practices.

60.     For example, and as described herein, California's Consumer Legal Remedies Act ("CLRA"), Unfair Competition Law ("UCL"), and False Advertising Law ("FAL") prohibit a range of deceptive, unfair, and unlawful business practices, including misleading advertising and the concealment of material terms. These statutes are particularly relevant to business conduct surrounding automatically renewing subscriptions, where companies must clearly and conspicuously disclose renewal terms, obtain affirmative consent, and provide easy-to-use cancellation mechanisms. A failure to do so—such as by obscuring material terms, misleading consumers about pricing or commitment periods, or erecting barriers to cancellation—violates these laws, and businesses will be liable for engaging in practices the California Legislature has specifically identified as harmful to consumers.

61.     Furthermore, in 2010, the California Legislature found the need to "end the practice of ongoing charging of consumer credit or debit cards or third party payment accounts without the consumers' explicit consent for ongoing shipments of a product or ongoing deliveries of service." Cal. Bus. & Prof. Code § 17600. The Legislature enacted the Automatic Renewal Law ("ARL") for that purpose. Cal. Bus. & Prof. Code §§ 17600, *et seq.*[1]

62.     As more businesses adopt deceptive renewal and subscription practices, the California Legislature continues to amend the ARL to try to close the evasion cycle. In 2018, California's Senate Bill 313 amended Section 17602 of the ARL, adding new requirements meant to increase consumer protections for, among other things, orders that contain free trial and promotional pricing, and subscription agreements entered into online. The California Legislature again amended the ARL in 2022, adding additional notice, disclosure, and cancellation requirements. *See* Cal. Bus. & Prof. Code

---

[1] Citations to the ALR are to the version of that law effective June 30, 2025.

§§ 17602(a)(4)(A)-(E), 17602(b)(1)-(2), 17602(d)(1)-(3).

63.    The ARL makes it "unlawful for any business making an automatic renewal or continuous service offer to a consumer in this state to do any of the following":

- "Fail to present the automatic renewal offer terms or continuous service offer terms in a clear and conspicuous manner before the subscription or purchasing agreement is fulfilled and in visual proximity . . . to the request for consent to the offer. If the offer also includes a free gift or trial, the offer shall include a clear and conspicuous explanation of the price that will be charged after the trial ends or the manner in which the subscription or purchasing agreement pricing will change upon conclusion of the trial."

- "Charge the consumer's credit or debit card, or the consumer's account with a third party, for an automatic renewal or continuous service without first obtaining the consumer's affirmative consent to the agreement containing the automatic renewal offer terms or continuous service offer terms, including the terms of an automatic renewal offer or continuous service offer that is made at a promotional or discounted price for a limited period of time."

- "Fail to provide an acknowledgment that includes the automatic renewal offer terms or continuous service offer terms, cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer. If the automatic renewal offer or continuous service offer includes a free gift or trial, the business shall also disclose in the acknowledgment how to cancel, and allow the consumer to cancel, the automatic renewal or continuous service before the consumer pays for the goods or services."

Cal. Bus. & Prof. Code § 17602(a)(1)-(3).

64.    Further, pursuant to amendments effective July 1, 2025, the ARL makes it unlawful for businesses making an automatic renewal offer to:

- "Fail to obtain the consumer's express affirmative consent to the automatic renewal or continuous service offer terms."

- "Include any information in the contract that interferes with, detracts from, contradicts, or otherwise undermines the ability of consumers to provide their affirmative consent to the automatic renewal or continuous service."
- "Fail to maintain verification of the consumer's affirmative consent for at least three years, or one year after the contract is terminated, whichever period is longer."
- "Misrepresent, expressly or by implication, any material fact related to the transaction, including, but not limited to, the inclusion of an automatic renewal or continuous service, or any material fact related to the underlying good or service."

Cal. Bus. & Prof. Code § 17602(a)(4)-(7).

65.     Section 17602(c) of the ARL further provides:

- "A business that makes an automatic renewal offer or continuous service offer shall provide a toll-free telephone number, electronic mail address, a postal address if the seller directly bills the consumer, or it shall provide another cost-effective, timely, and easy-to-use mechanism for cancellation that shall be described in the acknowledgment specified in paragraph (3) of subdivision (a)."

Cal. Bus. & Prof. Code § 17602(c) (emphasis added).

66.     Additionally, the ARL also requires business to allow online cancellation of auto-renewing memberships or recurring purchases that were initiated online. Section 17602(d) provides:

- "[A] business that allows a consumer to accept an automatic renewal or continuous service offer online shall allow a consumer to terminate the automatic renewal or continuous service exclusively online, at will, and without engaging any further steps that obstruct or delay the consumer's ability to terminate the automatic renewal or continuous service immediately."

Cal. Bus. & Prof. Code § 17602(d)(1) (emphasis added).

67.     The ARL further specifies that a seller who provides an automatic offer "shall provide a method of termination that is online in the form of either of the following: (A) A prominently located direct link or button which may be located within either a customer account or profile, or within either device or user settings[; or] (B) By an immediately accessible termination email formatted and

provided by the business that a consumer can send to the business without additional information." Cal. Bus. & Prof. Code § 17602(d)(1)(A)-(B).

68.    Section 17601(a) of the ARL defines the term "Automatic renewal" as a "plan or arrangement in which a paid subscription or purchasing agreement is automatically renewed at the end of a definite term for a subsequent term." Cal. Bus. & Prof. Code § 17601(a).

69.    Section 17601(b) of the ARL defines the term "Automatic renewal offer terms" as "the following clear and conspicuous disclosures: (1) That the subscription or purchasing agreement will continue until the consumer cancels. (2) The description of the cancellation policy that applies to the offer. (3) The recurring charges that will be charged to the consumer's credit or debit card or payment account with a third party as part of the automatic renewal plan or arrangement, and that the amount of the charge may change, if that is the case, and the amount to which the charge will change, if known. (4) The length of the automatic renewal term or that the service is continuous, unless the length of the term is chosen by the consumer. (5) The minimum purchase obligation, if any." Cal. Bus. & Prof. Code § 17601(b).

70.    Pursuant to Section 17601(c) of the ARL, "clear and conspicuous" or "clearly and conspicuously" means "in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from the surrounding text of the same size by symbols or other marks, in a manner that clearly calls attention to the language." Cal. Bus. & Prof. Code § 17601(c).

71.    Section 17603 of the ARL provides that where a "business sends any goods, wares, merchandise, or products to a consumer, under a continuous service agreement or automatic renewal of a purchase, without first obtaining the consumer's affirmative consent[,]" the material sent will be deemed "an unconditional gift to the consumer, who may use or dispose of the same in any manner he or he sees fit without any obligation whatsoever on the consumer's part to the business[.]" Cal. Bus. & Prof. Code § 17603.

72.    As alleged below, Adobe's practices regarding its subscriptions violate the CLRA, UCL, FAL, and ARL.

**B.    Adobe's Business**

73.     Adobe was founded in December 1982 and became a major provider of software tools widely used by consumers, professionals, and businesses globally.

74.     For many years following its founding, Adobe sold its software products under the traditional perpetual license model. Customers paid a one-time fee to acquire the software and could use it indefinitely on compatible devices.

75.     Adobe's flagship software products, including Photoshop, Illustrator, and Premiere Pro, were distributed via physical media such as CDs and DVDs and later as downloadable installers.

76.     Under the perpetual license model, customers were entitled to use the purchased version indefinitely and could opt to purchase upgrades or newer versions at additional cost if they wished.

77.     This model provided customers with certainty that they could retain access to software functionality they had paid for without incurring ongoing charges.

78.     Adobe's software, especially in the creative and professional markets, was widely regarded as industry-standard during the 1990s and 2000s, with a large installed user base purchasing licenses outright.

79.     Beginning in the early 2010s, Adobe began investing heavily in cloud technologies and internet-based delivery of software services.

80.     In 2013, Adobe officially announced the end of sales of perpetual licenses for its Creative Suite products, instead introducing Creative Cloud—a subscription-based service providing access to Adobe's suite of applications.

81.     Creative Cloud launched as a subscription-only model requiring customers to pay monthly or annual fees to access software, services, and cloud storage, replacing the traditional model of a one-time purchase.

82.     The move quickly caused confusion and backlash among consumers. (*Adobe's Creative Cloud Move Causes Outcry and Confusion*, FORBES, May 9, 2013, available at https://www.forbes.com/sites/adriankingsleyhughes/2013/05/09/adobes-creative-cloud-move-causes-outcry-and-confusion/)

83.     Adobe marketed Creative Cloud as offering benefits including automatic updates,

cloud syncing, access across multiple devices, and new collaborative features not available under perpetual licenses.

84.    Adobe phased out availability of standalone versions of its software, making Creative Cloud the only option for new customers seeking Adobe's products.

85.    Adobe's transition influenced industry trends broadly, accelerating the adoption of subscription-based delivery models among other major software providers.

86.    But as it moved to subscription-based services, Adobe began implementing the deceptive and unfair practices described in this Complaint to confuse, mislead, and lock consumers into expensive subscriptions.

87.    In early 2024, the Federal Trade Commission ("FTC") filed a lawsuit against Adobe, alleging that Adobe used deceptive "dark patterns" in its subscription sign-up and cancellation processes. The FTC claimed Adobe's interfaces intentionally obscured or complicated cancellation options, making it difficult for consumers to terminate Adobe subscriptions.

88.    The FTC detailed that Adobe employed tactics such as pre-checked opt-in boxes, unclear language, and multi-step navigation designed to frustrate or delay cancellations, effectively trapping consumers into ongoing payments.

89.    Adobe's shift to a subscription-based model and the associated use of complex interface designs have caused confusion and harm to consumers, who frequently report difficulty understanding the terms of their subscriptions, challenges in managing or canceling their accounts, and unexpected charges and exorbitant termination fees. These practices cause confusion and injuries to consumers who expect greater honesty and control over software use and billing.

### a.    Adobe's Subscriptions

90.    Adobe develops and distributes a suite of digital content creation and editing software products used in photography, graphic design, video production, illustration, document management, and other fields. These products include, among others, Adobe Photoshop, Adobe Illustrator, Adobe

Premiere Pro, Adobe After Effects, Adobe InDesign, Adobe Lightroom, and Adobe Acrobat.[2]

91.    Adobe markets these software tools to a broad base of consumers, including individuals, students, creative professionals, small businesses, and enterprise customers. Adobe offers access to these tools either individually or bundled together as part of its Creative Cloud platform, which also includes supplemental services such as cloud storage, software updates, and online collaboration features. Adobe's software is offered exclusively through subscription-based access.

92.    Adobe provides individual subscriptions for each product, as well as bundles that include multiple products. Adobe has three subscription types: "Annual" subscriptions, "Annual, billed monthly" (ABM) subscriptions, and "Monthly" subscriptions. The ABM subscription requires a commitment of 12 months, with the total cost divided into twelve monthly payments. Not every subscription is available for every product or bundle. However, ABM is available for almost every product and bundle.

93.    Annual, ABM, and Monthly subscriptions are all set for automatic renewal in that the subscription "is automatically renewed at the end of a definite term for a subsequent term." *See* Cal. Bus. & Prof. Code § 17601(a).

94.    Plaintiff and proposed class members are consumers who had Annual, ABM, or Monthly subscriptions for Adobe products.

95.    Plaintiff brings this Action on behalf of himself and similarly situated individuals to remedy harms caused by Adobe's deceptive and unfair practices regarding its subscriptions.

**C.    Adobe Violates Consumer Protection Laws.**

96.    In the context of its subscriptions, Adobe violates consumer protection laws in four main ways: 1) Adobe's advertising and statements regarding its subscriptions are deceptive and

---

[2] Adobe Photoshop is a raster graphics editor used for editing digital images, including photographs and other pixel-based artwork. Adobe Illustrator is a vector graphics editor used to create scalable illustrations and design elements. Adobe Premiere Pro is professional-grade video editing software. Adobe After Effects is used to create motion graphics and visual effects. Adobe InDesign is a desktop publishing application used for designing and formatting print and digital layouts such as magazines, brochures, books, and marketing materials. Adobe Lightroom is a photo editing and management tool designed primarily for organizing, processing, and enhancing large volumes of digital photographs. And Adobe Acrobat enables users to create, edit, and manage PDF documents, including for legal, administrative, and commercial purposes.

misleading; 2) Adobe fails to adequately disclose the terms of its subscriptions; 3) Adobe's terms for its subscriptions constitute unfair business practices; and 4) Adobe makes it impermissibly difficult to cancel subscriptions.

### a. Adobe's Subscription Flow

97.    On its website, www.adobe.com, Adobe advertises and offers its subscription plans directly to consumers, providing a platform through which they can enroll in a subscription.

98.    A consumer interested in a subscription is directed through a set order of pages on the website to view subscriptions and prices, choose add-on services, provide personal and billing information, and ultimately agree to the subscription. That process is referred to herein as the "Subscription Flow."

99.    Adobe employs deceptive and unfair practices in its subscription advertising and Subscription Flow

100.    The home page of Adobe's website advertises its subscriptions. The images and text on the homepage may vary each visit, but consumers are always invited to view Adobe's plans or products.



(An example of Adobe's home page)

101.    Following the links advertising Adobe's products and plans leads the consumer to a "Plans and Pricing" page.

102. At the outset of the relevant period, the Plans and Pricing page displayed prices listed on a per month basis as shown below.



103. But the prices displayed on this page were not for monthly subscriptions. Rather, the displayed price was for an ABM plan – a year-long contract with the total cost spread across monthly payments. Adobe did not disclose this fact anywhere on the page, let alone near the advertised price.

104. For a few weeks in 2024 and again beginning in late March 2025, Adobe added the words "Annual, billed monthly" near the price displayed on the "Plans and Pricing" page.



(Close up)

105.    But within the box for each subscription option, the largest text is the price expressed as a price per month. Three words, "Annual, billed monthly" appear in small, indistinctive text. Nowhere on this page, in any size text, does Adobe disclose the terms of the annual commitment, renewal, or termination fees.

106.    By selecting "Buy now" or "See plan & pricing details" a consumer is directed to the next page that shows the same per-month price (i.e. "US$19.99/mo"). In smaller and less-contrasting text than the advertised price, the words "Annual, billed monthly" appear. The ABM subscription is preselected without any action taken by the consumer.





107.    Again, the largest, bold, and most prominent text on this page is the price expressed as a price per month.

108.    Below the price, and in significantly smaller and less-contrasting text, the words "Fee applies if you cancel after [a certain date]" appear.

109.    The consumer is also given the option to choose the annual option. For subscriptions



that have a true month-to-month subscription option, that option is also shown. However, the ABM subscription is still preselected, and the month-to-month option displays a much higher price.

110.    Alternatively, if the consumer followed a link on the website for a "Free trial" for a certain product, the consumer is brought straight to this step. The very-similar screen contains generic



language about the free trial, but the terms of the subscription and free trial are still not clearly and conspicuously disclosed.

111.    Clicking the "Continue" button (through either the original flow or through a "free trial" page) takes the consumer to this screen where additional products are offered also as a price per month.

112.    On the next page, Adobe forces the consumer to provide Adobe with their email address and agree that Adobe can send "personalized emails" about products and services.

1

2     113.     Except for the heading, the largest and most prominent text is the price displayed on

3 a per month basis.

4     114.     The next and final screen, the "Checkout Page," requires the consumer to enter their

5 billing information. Again, except for the heading, the largest and most prominent text is the price

6 displayed on a per month basis.

7

8

9



17

18     115.     Limited additional information is provided after the billing information section in small

19 print near the bottom of the screen (the "Fine Print").

20     116.     By clicking on "Credit/Debit," "G Pay" or "amazon pay," the Fine Print is pushed to a

21 small box at the very bottom of the screen.

22

23

24                         [This space is intentionally left blank.]

25

26

27

28



117.    For consumers who click on "PayPal," the Fine Print disappears completely.

118.    The Fine Print only reappears once the consumer has linked their PayPal account (with all their billing information) to Adobe.

119.    No matter how the consumer adds their billing information, the Fine Print is the smallest text on the page and provides only limited information. And that information does not describe the termination fees or that the consumer is locked in for at least one year.

120.    Furthermore, when the consumer reaches the portion of the Subscription Flow with the Fine Print, they have already provided their billing information.

121.    This is the first time in the Subscription Flow that hyperlinks to the Terms of Use and Subscription and Cancellation Terms are shown to the consumer. They are not disclosed during any earlier step of the Subscription Flow. At this point, a consumer has already been forced to provide their personal and billing information.

122.    Each subscription offered by Adobe automatically renews at the end of the agreement term.

123.    The Subscription Flow for each product offered by Adobe is substantially similar to the example shown above.

*Foret v. Adobe Inc.* - Class Action Complaint

124. In the summer of 2025, after consumers made demands for arbitration against Adobe for these deceptive practices as described below, Adobe made changes to its Subscription Flow.

125. While the "Plans and Pricing" page remains the same, the first subscription window for a product now includes the following sentence: "Fee applies of half your remaining annual commitment if you cancel after [a certain date]." Additionally, all products, including the most popular ones like the photography bundle shown in the example above, now include a "monthly" option, whereas this option was previously not available.



126. The next two screens are substantively the same as the examples shown above. On the updated "Checkout Page," the Fine Print is the same and remains the smallest font on the page but is now closer in proximity to the price.



### b. Adobe Falsely Advertises Its Subscriptions.

127. Throughout its website advertising and Subscription Flow, Adobe uses deceptive practices and fails to disclose the terms of its subscriptions. Particularly as it relates to the ABM subscriptions, reasonable consumers are deceived into believing they are agreeing to a month-to-month plan that can be cancelled at any time and are not made aware of material terms of the automatically renewing subscription, including its cancellation terms.

128. Adobe's advertising suggests a flexible monthly plan, while in reality these plans commit users to a full year with penalties for early cancellation. The distinction between a "monthly" membership (which implies flexibility) and an "annual, billed monthly" membership (a year-long contract) is not clear in Adobe's advertising and Subscription Flow and misleads consumers about the terms of their subscriptions.

129. The "monthly payment" aspect of the plan gives consumers the impression that they can cancel at any time, which is not true. This misleads consumers into thinking they are signing up for a more flexible plan than they actually are.

130.    On the Plans and Pricing page, Adobe advertises the price for the subscriptions on a per month basis. However, the price advertised is actually for an annual subscription with payments due monthly. For each product and bundle it offers, Adobe either does not offer a true month-to-month subscription or such a subscription costs substantially more money.

131.    For only a few months during the relevant time period—during November 2024 and from late March 2025 to present—Adobe added the phrase "Annual, billed monthly" near the advertised price on the Plans and Pricing Page, but in significantly smaller and less noticeable text.

132.    Reasonable consumers continued to believe that the advertised rate was for a per month subscription.

133.    The advertised prices for the ABM subscription are misleading or have the capacity, likelihood or tendency to deceive or confuse the public.

134.    The advertised prices for the ABM subscription materially misrepresent the true nature of the subscription because it appears that the subscription is for a month-to-month subscription.

135.    Instead, Adobe sells a materially different subscription than the one suggested by the advertised prices, including in terms of length, cost, and cancellation terms.

136.    Furthermore, Adobe advertises its annual and monthly subscriptions without describing the true nature of the product, in that Adobe does not adequately disclose applicable fees, renewals, and other terms.

137.    Adobe knew or should have known by the exercise of reasonable care that the advertised subscription prices and terms were misleading.

   **c.    Adobe Does Not Adequately Disclose the Terms of its Automatic Renewal Subscriptions**

138.    Plaintiff and Class members are "consumers" as defined by California Business and Professions Code § 17601(a)(4), in that they sought or acquired Adobe's software for personal, family, or household purposes.

139.    Under the ARL, businesses are required to disclose the terms of automatic renewal or continuous service offers in a clear and conspicuous manner before the consumer subscribes. Cal. Bus & Prof Code § 17602(a)(1).

140.    The terms that are disclosed must clearly and conspicuously state: (a) that the subscription or purchasing agreement will continue until the consumer cancels; (b) the description of the cancellation policy that applies to the offer; (c) the recurring charges that will be charged to the consumer's credit or debit card or payment account with a third party as part of the automatic renewal plan or arrangement, and that the amount of the charge may change, if that is the case, and the amount to which the charge will change, if known; (d) the length of the automatic renewal term or that the service is continuous, unless the length of the term is chosen by the consumer; and (e) the minimum purchase obligation, if any. Cal. Bus. & Prof. Code § 17601(b).

141.    Businesses are also required to obtain the consumer's affirmative consent to the agreement and provide an acknowledgment that includes the automatic renewal offer terms or continuous service offer terms, cancellation policy, and information regarding how to cancel in a manner that is capable of being retained by the consumer. Cal. Bus. & Prof. Code § 17602(a)(2)-(3).

142.    Further, as of July 1, 2025, businesses are 1) required to obtain a consumer's express affirmative consent to the automatic renewal offer terms, 2) prohibited from including any information in the contract that interferes with, detracts from, contradicts, or otherwise undermines the ability of consumers to provide their affirmative consent to the automatic renewal, and 3) prohibited from misrepresenting, expressly or by implication, any material fact related to the transaction. Cal. Bus. & Prof. Code § 17602(a)(4), (5), (7).

143.    "Clearly and conspicuously" means in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from the surrounding text of the same size by symbols or other marks, in a manner that clearly calls attention to the language. Cal. Bus. & Prof. Code § 17601(c).

144.    Adobe's Subscription Flow does not adequately disclose the terms of the subscriptions.

145.    For ABM subscriptions, the only reference to any terms during the ABM Subscription Flow are 1) the phrase "annual, billed monthly," 2) a note that "Fee applies if you cancel after [a certain date]," and 3) the Fine Print. As explained above, the last step in the Subscription Flow, the Checkout Page, includes only the Fine Print and the phrase "Annual, billed monthly" in small print.

146.    The Fine Print and phrase "Annual, billed monthly" on the Checkout Page is not clear

and conspicuous, as defined in the ARL. Cal. Bus. & Prof. Code § 17601(c). None of the relevant language presented during the Subscription Flow meets this standard. These terms appear in small, often grey font—approximately 8.5-point size—with no emphasis or prominence compared to other page elements. This formatting renders the text difficult to read and easy to overlook, especially in comparison to larger, bolded text elsewhere on the page like the subscription price that is expressed on a per month basis. The relevant text is not in larger or the same size font as the surrounding text nor set off by symbols or other marks that "clearly calls attention to the language."

147.    The Checkout Page—and indeed no part of the Subscription Flow—adequately presents the full automatic renewal offer terms required by the ARL. *See* Cal. Bus. & Prof. Code § 17602(a)(1). For example, Adobe fails to "clearly and conspicuously disclose" that the "annual, billed monthly" plan entails a one-year commitment or that early cancellation will incur a termination fee. Adobe also does not clearly state that the subscription continues until canceled, as required by § 17601(b)(1).

148.    While the Fine Print contains phrases like "cancel anytime," it also includes conflicting language requiring cancellation by specific dates to avoid fees, making it unclear whether consumers may cancel at any time or only before a set deadline.

149.    Adobe also fails to clearly disclose the applicable cancellation policy, as required by Cal. Bus. & Prof. Code § 17601(b)(2). While the Checkout Page refers to cancellation options, it omits critical details, including that consumers on the "Annual, billed monthly" plan are subject to a cancellation fee of 50% of the remaining contract obligation if they cancel after 14 days. This information appears only in a separate hyperlink titled "Subscription and Cancellation Terms," not on the Checkout Page itself or anywhere else in the Subscription Flow.

150.    Similarly, the Subscription Flow omits or obscures material consequences of canceling other plans. For the "Yearly, billed upfront" plan, Adobe fails to conspicuously state that the payment is entirely non-refundable after 14 days. The "Monthly" plan also lacks clear disclosure that payments are non-refundable after 14 days, despite claiming users may "cancel anytime."

151.    The Checkout Page also fails to clearly disclose the recurring charges that will be billed to consumers' Payment Methods, in violation of Cal. Bus. & Prof. Code § 17601(b)(3).

152.    Adobe does not disclose the length of the automatic renewal term, in violation of § 17601(b)(4). For example, the "Yearly, billed monthly" plan references a "one-year term," followed by monthly renewals, without clarifying when the term begins or ends.

153.    The Checkout Page does not indicate which time zone governs the cancellation deadlines, despite references to specific dates. This omission is material, particularly given the high cost of some plans, which may total over $779.88 annually.

154.    The cancellation policy described on the Checkout Page is incomplete and internally inconsistent. Although Adobe includes a "Subscription and Cancellation Terms" hyperlink elsewhere on the page, those details are not presented near the final purchase button and are not shown during the enrollment process. Consumers are not prompted to read them prior to completing the transaction.

155.    By failing to disclose the true terms of the subscriptions, and through the use of these confusing and deceptive practices, Adobe also interferes with, detracts from, contradicts, and otherwise undermines consumers' ability to provide their affirmative consent, and misrepresents material facts of the transaction, including the price, term, and cancellation policy. Cal. Bus. & Prof. Code § 17602(a)(5), (7).

156.    Moreover, at no stage in the Subscription Flow does Adobe require consumers to read or agree to any terms of service for their Adobe subscriptions, such as clicking a checkbox for automatic renewal terms. As a result, Adobe automatically renews subscriptions and charges customers' payment methods without first obtaining "affirmative consent," or "express affirmative consent." Cal. Bus. & Prof. Code § 17602(a)(2), (4).

157.    Additionally, Adobe's misleading and confusing statements, offers, and terms, as described in the Subscription Flow, undermined the ability of consumers to provide their affirmative consent or express affirmative consent because the consumer did not understand to what they were agreeing. Cal. Bus. & Prof. Code § 17602(a)(2), (4).

158.    Likewise, Adobe's early termination fee—50 percent of the remaining monthly payments for ABM plans—is obscured within the depths of Adobe's website, often requiring users to navigate through links to separate pages only found in small print to uncover the fee details. At no point during the subscription process did Adobe "clearly and conspicuously disclose" the early

termination fee, or the one-year commitment entailed by the "annual paid monthly" plan.

159.    Further, Adobe does not provide an adequate acknowledgment in a manner that is capable of being retained by the consumer that includes the renewal offer terms, cancellation policy, and information regarding how to cancel. *See* Cal. Bus. & Prof. Code 17602(a)(3).

160.    Adobe's failure to disclose key terms—including how and when to cancel, the consequences of cancellation, and the availability of refunds—prevents consumers from making informed decisions at the point of purchase. Under Cal. Bus. & Prof. Code § 17602(a), Adobe was required to provide this information in immediate proximity to the request for consent to the automatic renewal.

161.    As a result of these deficiencies, Plaintiff was not fully aware of the automatic renewal programs he was entering into. He did not receive clear notice that his subscriptions would continue until canceled, nor that canceling could trigger significant fees or render payments non-refundable. Adobe's disclosures failed to meet the statutory requirements for transparency and informed consent.

162.    Thus, Adobe's subscription offers and procedures violate the ARL.

163.    Likewise, these same practices—including the omission of information and obscuring relevant terms—are misleading, deceptive, unfair, and injurious under the CLRA, FAL, and UCL.

**d.  Adobe's Cancellation Penalty for the ABM Subscription is Unfair.**

164.    When a consumer with an annual-billed-monthly subscription attempts to cancel their subscription, Adobe will only cancel their subscription if the consumer pays a termination penalty equivalent to 50% of the monthly payments remaining in the 12 months since they signed up.

165.    This penalty is an unfair business practice because it is excessive and disproportionate.

**e.  Adobe's Cancellation Process is Unlawfully Burdensome.**

166.    The ARL requires that if the business allows consumers to accept an automatic renewal service offer online, which Adobe does, it must allow consumers to terminate the service "online, at will, and without engaging any further steps that obstruct or delay the consumer's ability to terminate the automatic renewal or continuous service immediately." Cal. Bus. & Prof. Code § 17602(d)(1). Further, the method of cancellation must be through "[a] prominently located direct link or button which may be located within either a customer account or profile, or within either device or user

settings [or] [b]y an immediately accessible termination email formatted and provided by the business that a consumer can send to the business without additional information." Cal. Bus. & Prof. Code § 17602(d)(1)(A)-(B).

167.    Adobe's subscription model charges a fee for early cancellation of annual contracts, which is not adequately disclosed or is framed in a way that seems to contradict the flexibility implied by "paid monthly" memberships. Adobe also makes it difficult, if not impossible, for consumers to cancel their APM subscriptions by requiring users to go through several steps to cancel a subscription, resulting in a burdensome and confusing process.

168.    Adobe's cancellation process involves navigating through a maze of pages on the Adobe website and being required to submit feedback and click through various offers. And even when users try to cancel their subscriptions online, they often are required to contact Adobe via phone to fully cancel their subscriptions. During the telephonic process, users are subject to dropped calls, repeated transfers, attempts to persuade customers to retain their subscriptions, and other impediments designed to deter cancellation.

169.    At times, Adobe may disable the ability to cancel online entirely, for example if Adobe is processing payment or if there is a problem with the payment. This forces users to find other channels to attempt to cancel their subscriptions.

170.    By imposing cancellation fees, obscuring key terms, and requiring multi-step or offline procedures to cancel, Adobe violates the ARL's requirement that automatic renewal services be presented transparently and be terminable "online, at will."

* * *

171.    Adobe's failure to clearly disclose material terms, combined with its obstructive and inconsistent cancellation process, deprives consumers of the ability to make informed purchasing decisions and to freely exit unwanted subscription agreements. These practices result in financial harm, confusion, and frustration for consumers, many of whom are unknowingly enrolled in ongoing paid subscriptions with limited recourse for timely and effective cancellation.

**D.    Consumers Are Deceived and Harmed by Adobe's practices and Terms.**

172.    Reasonable consumers have been and will continue to be misled by Adobe's deceptive

1    practices.

2    173.    In Adobe's own forum,[3] consumers regularly express their confusion and that they

3    believed they were signing up for a month-to-month subscription and did not know about significant

4    parts of the terms of the deals, including the termination fees.



**WellItIsWhatItIs**
New Here, Jun 01, 2022

This isn't transparent. Consumers aren't used to the words "a fee" being used to describe $300 charges. No other major subscription service (YouTube, Netflix, Spotify) uses this practice.

Hotels spell out clearly how much a cancellation fee will be, if there is one. Airlines, car rentals typically are clear about it too. But this is Adobe not a hotel or car rental?

If a cancellation fee isn't specified, most people assume it's small.

It's reasonable to assume that most customers *do* agree to what they see written there. They are willing to be charged monthly if they forget to cancel. They'd probably be fine with a $20/30 "cancellation fee". They might think it's annoying, but they'd look back at your wording and say "ah, yes, I see."

People feel there's a bait-and-switch because you're using the term "cancellation fee" to indicate "$90-300 immediate charge". Based on the amount of people discussing this on a daily basis on the official forum, it's a common source of confusion and frustration.

Rather than trying to say "bUt It'S iN the T3rmS", try to get to the root of why your customers are confused, and resolve their confusion. If people are bringing up the same issue over and over, your terms aren't clear enough.

For example, include the chart from the article "cancellation details for common Adobe plans" directly on the page where people are agreeing to the terms. Or alter the wording to make it exactly clear what you mean by "fee".

Seems like a win-win to give customers a better understanding, billing departments fewer complaints, and PR with a better image. Accessible transparency is a great way to build trust and loyalty.

It's awesome that you're replying to this forum and trying to help customers yourself. I can see you're the kind of Adobe professional that wants users to get the most of this service, and to walk away satisfied. (no sarcasm intended!)

---

[3] The Adobe Community Forum is an online message board operated by Adobe where users can post questions, share issues, and seek help regarding Adobe products and services. Adobe moderators and other users respond to posts.

*Foret v. Adobe Inc.* - Class Action Complaint



**Cancellation Fees should be illegal**

**GIna28663861anav**
New Here, Mar 01, 2023

Can somone please explain to me why I am getting charged $197 exit fees when I pay a monthly subscription?

I am trying to get answers/ reasoning of why this amount is so high or at least a break down of costs but I just get sent through multiple webpages that give me no information.

I beleive these exit fees are beyond ridiculous for a monthly subscription and I have no way of navigating it.

I would not recommend Adobe to any designers. I really hope gen Z can invent a better program so Adobe doesn't have the monopoly in the workplace and design field. Absolutely rdiculous and unapproachable.

TOPICS   Account management , Licensing , Plans and purchase , Terms of use

👁 7.0K   🗛 Translate   🚩 Report    Reply

**Cancellation Fee**

**syd5050**
New Here, Feb 20, 2025

Don't know where to leave a review so I'm leaving one here.

I wanted to get Adobe for a month to just test it out and see if I liked it but by the end of the month I wanted to cancel It but then was given a $99 early cancelation fee. Just because I didn't use this for a year I'm now being charged. This is beyond stupid seeing as I just wanted to test It out. Adobe is a money-hungry company that is way overpriced and I'm beyond livid. I'm a poor college student trying to get by and simply can't afford to deal with this. beyond disappointed...

👁 806   🗛 Translate   🚩 Report    Reply

## Cancellation fees! Deeply Misleading.



**BenSCsA**
New Here, Jul 21, 2021

Not really a question. Just wanted to say that I don't really mind being charged a cancellation fee as long as it is EXPLICITLY acknowledged at the outset. Currently it's buried in the TOS and frankly everyone who built the system and everyone who uses it KNOW that this information is that which every user who is choosing between a yearly subscription and month to month.

I'll say it again: I understand that Adobe makes plans around revenue which yearly subscribers have committed to paying. That said, I would have chosen differently had it been explicitly acknowledged at the outset.

They also know that **no one** has the luxury of being able to page through their 600 page TOS over a glass of wine.

Adobe knows this and I know this. Frankly this (as well as the total lack of human interaction in tech support) has really made me hate the company. And yes, a company with revenue in the BILLIONS can afford to waive it. They're milking people by intentionally misleading them and I hope to god someone sets up a class action lawsuit. Just saying.

Don't bother replying to my post as I'm venting and I have no interest in hearing about how I should have spent several hours of my life reading the TOS.

👁 1.8K   文A Translate   ⚑ Report                    Reply

.

## Predatory Free Trial Cancellation Fee



**nicole_8183**
Community Beginner, Oct 27, 2024

I used to be a big user of photoshop but hadn't used it in a few years. I recently wanted to do some photoshopping again and figured I'd try out the free trial with AI. I liked it and wanted to mess around a little more so figured I'd pay for an additional month and let my free trial roll over into a new month. It was not clear AT ALL that there would be an additional $126 after that next month to cancel the photoshop subscription. I paid it because I don't have the time to read the predatory fine print and see if just keeping photoshop would results in ANOTHER cancellation fee. I was a believer in paying for the product to support the company, but I will never again pay adobe for any of their softwares. A crooked greedy company. The free online photoshop look-alikes are where I will go from now on. I hope illegal downloads and competitors ruin you.

TOPICS  Billing

👁 1.7K   文A Translate   ⚑ Report                    Reply

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



## Feeling deceived by predatory cancellation fee

**Decived Customer**
Community Beginner, Nov 23, 2024

I signed up for a Trial. The welcome message stated: "After the free trial ends on August 25, 2024, you will be charged CAD $29.37 (incl. tax) monthly. Your subscription will automatically renew annually until you cancel (price subject to change)."
Note the use of 'monthly' here.
When I went to cancel they will bill for for the remained of the year, in my case another $116.96.
I feel deceived, and I have a very low opinion of the predatory billing practice. Shame on Adobe.

I will make an effort publicize this practice to help other prospects from making a similar naive mistake.

I see the Better Business Bureau has this when I logged this experience there:

## Current Alerts For This Business

**Government Action: BBB reports on known government actions involving business' marketplace conduct::**
**FTC vs Adobe Systems**
The Federal Trade Commission is taking action against software maker Adobe and two of its executives, Maninder Sawhney and David Wadhwani, for deceiving consumers by

**TOPICS**  Billing

👁 413   🗛 Translate   🏳 Report                                    **Reply**

## Adobe hidden cancellation fees

**CamilleSC65**
New Here, Jul 13, 2021

Just wanting to warn people that when you think you're entering a month-to-month plan with Adobe they are actually just waiting for you to cancel so they can charge you a 50% cancellation fee. You can't just leave when you want like EVERY other app I use. Their moderator on here will just throw their terms of service link up that zero people read when signing up so I'm not expecting too much help here but I wanted to let unsuspecting future customers know.

**TOPICS**  Account management , Billing

👁 801   🗛 Translate   🏳 Report                                    **Reply**

*Foret v. Adobe Inc.* - Class Action Complaint



174.    Consumers across the internet express similar experiences.

175.    For example, users on Reddit report signing up for what they believed was a monthly plan, only to find out later that it was an ABM plan.

> I started a week free trial to make a quick poster, but I needed it for almost a week. My school required I used one of the services. Once the week was over, I had forgotten about canceling my trial. And I couldn't cancel my trial beforehand because the services would stop. I remember today (a few days after the trial ended). When I started the trial, it said that it would charge monthly. I thought "worst case scenario, if I don't cancel it in time I'm only out $20" I go to cancel and it's AN ANNUAL PLAN THAT CHARGES MONTHLY??? I have never heard of any service doing that, especially if it's not said anywhere. If I want to cancel it, I have to pay them $110??? I fucking hate adobe. Wtf do I do.

176.    In April 2025, YouTuber Felix Kjellberg, better known as PewDiePie and who has 110 million followers on YouTube, posted a video in which he detailed his own confusion with Adobe's subscription and his surprise that there would be a fee to cancel his subscription. That video has more than 6.9 million views, with many users likewise expressing their confusion with Adobe's practices.

177. Complaints also abound on consumer-focused websites like the Better Business Bureau.



**David G**

Date: 11/23/2024

⭐☆☆☆☆

I signed up for a Trial. The welcome message stated: "After the free trial ends on August 25, 2024, you will be charged CAD $29.37 (incl. tax) monthly. Your subscription will automatically renew annually until you cancel (price subject to change)." Note the use of 'monthly' here. When I went to cancel they will bill for for the remained of the year, in my case another $116.96. I feel deceived, and I have a very low opinion of the predatory billing practice. Shame on Adobe.



**Olivia Q**

Date: 10/30/2024

⭐☆☆☆☆

I started a Two week Free Trial, I just tried to cancel today to learn that were is a $99.95 cancellation fee because it is for an "annual plan" for their creative cloud storage, which was not clear when signing up to use the App. I had chossen the cheapest option and monthly option, when it turns out is still a year contract. I do not need a free cloud storage. I do not want this product for a year. I also wanted to try it out for more than two weeks, I was OK with purchasing one month while I still tried to figure out the program. But it isn't worth it and now it is charging $99 to cancel. Terrible business practices. No one's cloud storage is priced this high and with cancellation fees, this is outrageous.



**Abimelec F**

Date: 10/04/2024

⭐☆☆☆☆

I cant believe they charged me a cancellation fee for a service they marketed as a month to month service. Had I known this before I used this service, I would have NEVER signed up. This kind of marketing is anti-consumer and should be illegal. I will never use another Adobe software in my life and I urge others to not support a company who so openly behaves this way, even at the same time they are getting sued for it. This is disgusting.

*Foret v. Adobe Inc.* - Class Action Complaint

178.    Adobe's practices confuse, mislead, and trap their subscribers, injuring consumers and violating the law.

**E.    Adobe Attempts to Make Challenging its Practices Impossible.**

179.    During the relevant time period, Adobe required each of its customers, including Plaintiff, to agree to its non-negotiable Terms of Use. *See* Ex. A.

180.    The Terms of Use are not presented to or acknowledged by consumers during the Subscription Flow. Rather, a link to a separate page with the Terms of Use is hidden in inconspicuous text and the consumer is not required to view them.

181.    The Terms of Use apply broadly to customers of Adobe's software or services:

> These General Terms of Use ("**General Terms**"), along with any applicable Product Specific Terms (see section 1.2 (Product Specific Terms) below) (collectively, the "**Terms**") govern your use of and access to our websites, web-based applications and products, customer support, discussion forums or other interactive areas or services, and services such as Creative Cloud (collectively, the "**Services**") and your installation and use of any software that we include as part of the Services, including, without limitation, mobile and desktop applications, Sample Files and Content Files (defined below), scripts, instruction sets, and related documentation (collectively, the "**Software**").

Ex. A, preamble.

182.    Adobe's Terms of Use are structured to implement a dispute resolution system aimed at preventing consumers from effectively challenging Adobe's unlawful or unfair practices.

183.    First, the Terms of Use purport to require any consumer injured by Adobe to "try to resolve the dispute informally and in good faith by contacting [Adobe] and providing a written Notice of Claim." Ex. A, § 14.1.

184.    Then, when Adobe rejects the consumer's "informal" approach, the Terms of Use purport to limit where consumers can seek relief:

> If any dispute related to your Claim is not resolved within 30 days of receipt [of the Notice of Claim], any resulting legal actions must be resolved through either small claims court or final and binding arbitration.

*Id.*[4]

185.    Under Section 14.3 of the Terms of Use, Adobe mandates that arbitration must be with JAMS:

> If you reside in the Americas, JAMS will administer the arbitration in Santa Clara County, California, USA, pursuant to its Streamlined Arbitration Rules and Procedures.

*Id.* § 14.3

186.    But finally, even if consumers do bring their claims to arbitration, Adobe can entirely stop the arbitration from moving forward by refusing to pay its portion of the arbitrator's fee.

187.    Specifically, Adobe claims to be able to unilaterally and unconscionably force the consumers into small claims court (the "Small Claims Provision"):

> If either party files a Claim in arbitration that could have been brought in small claims court, the other party may provide notice that it wants the case decided in small claims court before the appointment of an arbitrator, and the arbitrator shall administratively close the case before assessing any fees, and the party bringing the Claim must proceed in small claims court in lieu of arbitration.

*Id.* § 14.5

188.    But small claims court is not an adequate or viable forum for consumers to pursue their claims against Adobe.

189.    In small claims court, Adobe's consumers are stripped of important rights, including the right to counsel, discovery, and appeal.

190.    In other words, even after forcing consumers to participate in a futile "informal" process and compelling them into expensive arbitration, Adobe claims to be able to unilaterally strip its consumers of rights required by principles of minimum fairness by forcing the claims into small claims court.

191.    This does not provide consumers like Plaintiff an adequate forum to vindicate their rights, and the Small Claims Provision is unenforceable.

---

[4] The arbitration clause forces Adobe customers to waive the right to a class action, but Adobe cannot selectively enforce this aspect of the Terms while it denies Plaintiff the right to pursue their claims by not complying with its own obligations under the arbitration agreement.

192.    Consequently, by breaching the Terms of Use and simply refusing to pay these fees, Adobe can halt arbitration indefinitely.

193.    In the end, unless a court intervenes, Adobe can extinguish any possibility of being held liable by its consumers.

**F.    Plaintiff Was Harmed.**

    **a.    Plaintiff Was Harmed by Adobe's Subscription Practices.**

194.    Plaintiff signed up for an ABM subscription of the Creative Cloud All Apps 100GB plan on Adobe's website after viewing the plans and prices advertised on the website. While visiting Adobe's website and going through the Subscription Flow, Plaintiff believed he was signing up for a month-to-month subscription. Plaintiff did not know he was committing to a yearlong contract, that the subscription would automatically renew, or that he would be subject to a cancellation penalty.

195.    Had Plaintiff known the terms of the subscription, he would not have agreed to it.

196.    Plaintiff cancelled his subscription in September 2023, encountering many obstacles in the process, and paid a termination fee of $84.

197.    Plaintiff subsequently re-subscribed to Adobe services in July 2025, when he signed up for a Lightroom subscription on Adobe's annual, prepaid plan.

    **b.    Plaintiff Attempted to Resolve His Disputes Under Adobe's Dispute Resolution Process, but Adobe Refused.**

198.    On October 1, 2024, undersigned counsel, on behalf of Plaintiff and other individuals seeking to arbitrate their claims, sent Notices of Claim to Adobe offering to negotiate a good-faith resolution of each individual's claims.

199.    In that letter, Plaintiff stated and substantiated claims under the ARL, CLRA, FAL, and UCL.

200.    But instead of engaging in good faith in its own 30-day "informal" dispute resolution period, Adobe waited until 30 days later to finally respond to Plaintiff and other claimants at all.

201.    And In Adobe's October 31 response, the company brushed off the Notices of Claim as inadequate pursuant to the Terms of Use. Adobe demanded that Plaintiff and other claimants start the 30-day period over again by submitting new notices. In support of this position, Adobe first relied

on language in Section 14.1 of the Terms of Use requiring that an individual's Notice of Claim "cannot be combined with a Notice of Claim for other individuals." Next, Adobe complained that Plaintiff's and the others' Notices of Claim—which were separate and individualized for each claimant—had been delivered by the shipping service together in one box instead of arriving individually. Adobe's objections to the Notices of Claim lacked merit.

202. Adobe's October 31 letter did not allege any other failure to comply with its Terms of Use.

203. Plaintiff's and the other individuals' further efforts to engage Adobe in any sort of informal resolution discussions failed.

204. On May 23, 2025, Plaintiff and other claimants filed demands to arbitrate these disputes. Plaintiff and other claimants filed the arbitration demands with JAMS and paid the associated fees in accordance with Adobe's Terms of Use and JAMS' rules.

205. On May 30, 2025, JAMS invoiced Adobe for its share of the non-refundable filing fees, totaling $192,500.00. The JAMS Streamlined Arbitration Rules and Procedures, which Adobe chose in its Terms of Use, required Adobe to pay these fees. Payment was due upon receipt of the invoice.

206. Adobe did not pay the invoice as required and refused to engage in the arbitration.

207. Instead, on May 30, 2025, Adobe and its Counsel submitted a letter to JAMS, in which it opted out of arbitration.

208. As to arbitrability of the dispute, Adobe stated:

> To the extent Claimants object to Adobe's election, they are free to do so. However, the parties' agreement at Section 14.5 makes clear that any objections to a small claims election must be heard and decided by the small claims court, not by an arbitrator. The court is the best judge of its own jurisdiction, for one thing, and this provision is also intended to protect Adobe's rights under the contract by preventing the assessment of arbitration fees in matters that are properly decided in small claims court pursuant to either party's election. For this reason, the parties' agreement requires the matter to be administratively closed immediately and before any fees are assessed, including any fees that might be assessed to determine a jurisdictional dispute. For reference, JAMS has previously honored these same contractual terms in comparable circumstances, such as last year in the matter referenced at Exhibit A to this letter.

209. Adobe then asserted that Plaintiff and other claimants must bring their claims in small

claims court even though the court lacks jurisdiction because the claims sought injunctive relief and monetary relief exceeding the small claims' court jurisdictional limit. Adobe nonetheless stated:

> In this case, it would be particularly inappropriate to allow Claimants to seek to impose fees on Adobe rather than accede to the jurisdiction of small claims court because it is facially implausible that these claims even come remotely close to exceeding the small claims jurisdictional threshold. As an initial matter, the Demands fail to include any monetary demand. Claimants left the "Amount in Controversy" field blank and do not reference any demand in the attached "detailed statement of Claimant's claims" at Exhibit A. This alone is reason to honor the election to send them to small claims court.
>
> Separately, it is evident from the nature of the claims that they would necessarily qualify for small claims court. Claimants each allege that they have "paid subscription fees to Adobe" for Annual, Paid Monthly ("APM") plans, that "Adobe's cancellation process lacks clear, upfront disclosures about renewal terms or cancellation fees," and that "Adobe's early termination fees for annual plans—often hidden in fine print—can be unexpectedly high, discouraging consumers from canceling." However, presuming these were individual subscriptions (and there is zero reason to think they were not), the maximum possible cancellation fees any user could have been assessed for cancelling a subscription to Adobe's full "Creative Cloud – All Apps" suite of products in a given year was no more than a few hundred dollars. Indeed, a sampling of the first 20 claimants by alphabetical order shows that 16 out of 20 claimants have never been charged an early termination fee at all (which raises separate serious questions about the diligence of Claimants' counsel in investigating these claims), and the other 4 of 20 claimants have been assessed combined early termination fees of $72.48. Where, under most circumstances, economic damages are contractually limited to the "aggregate amount that [each customer] paid for access to the Services and Software during the three-month period preceding the event giving rise to the liability" and there are no other theories of damage pleaded, economic damages for those 20 Claimants are necessarily under the small claims limit.

210. Adobe also asserted that Claimants did not comply with Adobe's Informal Dispute Resolution procedures:

> Independently, Claimants also failed to comply with another prerequisite to arbitration: the Informal Dispute Resolution procedures mandated by the Adobe Terms of Use. Those terms require customers to provide a Notice of Claim to Adobe and to engage in an Informal Dispute Resolution Process before initiating legal action, as set forth in Section 14.1 of the Terms (which include a requirement to provide "fair notice of your identity, a description of the nature and basis of your Claim, and the relief you are seeking, including the specific amount of any monetary relief you are seeking" and prohibit a notice being "combined with a Notice of Claim for

42

other individuals"). The purpose of this provision is to require an individualized fair notice of each customer's claim to enable a meaningful opportunity to evaluate and resolve the claim before any dispute goes to arbitration or small claims court. Independently, Claimants' failure to comply with the Informal Dispute Resolution process would also justify administratively closing this matter.

211.    Finally, Adobe took the position that its customers were not "consumers" under the JAMS rules, stating:

> Finally, although none of these Demands qualifies for arbitration (as set forth above), assuming they did, we note that under the provision of the Terms related to "Coordinated Actions" (Section 14.4), JAMS would need to make individual determinations with respect to how fees would be assessed for each Demand, including, for example, whether these Claimants using Adobe products for commercial purposes should split fees because they do not qualify as "consumers."

212.    Adobe also referenced its prior efforts in JAMS to prevent other arbitrations from proceeding because of the small claims election.

213.    JAMS then determined that it would not proceed to administer the arbitrations absent a court order.

### c.  The Small Claims Provision is Unenforceable.

214.    That Adobe's terms purportedly allow it to avoid any arbitration from occurring because of the small claims election means that its terms do not contemplate "arbitration" within the meaning of the Federal Arbitration Act and therefore the FAA does not preempt any state's law that prevents enforcement of Adobe's class action waiver, including California's *Discover Bank* rule.

215.    As a result, Plaintiff and Class members are entitled to a declaratory judgment that Adobe has breached its agreement to arbitrate with Plaintiff, has otherwise waived its right to arbitrate, and that Adobe's terms are not an "arbitration" within the meaning of the FAA.

216.    In addition, the Small Claims Provision is itself unconscionable and unenforceable.

217.    The Small Claims Provision is unconscionable in that it strips consumers' rights to counsel, discovery, and appeal, among other rights.

218.    In addition, Adobe is likely to be represented by a sophisticated corporate representative, and all the relevant information and documents are already in Adobe's possession. The Small Claims Provision is therefore one-sided.

43

219. The Small Claims Provision does not meet minimum fairness requirements, denies consumers important procedural protections, is overly one-sided, and does not provide consumers with an adequate forum to vindicate their rights.

220. The Small Claims Provision is therefore unenforceable.

221. Moreover, small claims court facially does not have jurisdiction over these claims. Plaintiff and other Class members seek injunctive relief under the FAL, UCL, and CLRA, but the small claims court does not have jurisdiction to award injunctive relief under these statutes. *See* Cal. Civ. Proc. Code § 116.220 (a)(5) (providing "[f]or an injunction or other equitable relief only when a statute expressly authorizes a small claims court to award that relief"). Nor would the small claims court have jurisdiction to award attorneys' fees or punitive damages exceeding the $12,500 jurisdictional limit. Cal. Civ. Proc. Code § 116.221.

222. Adobe therefore cannot force Plaintiff and Class members into small claims courts.

223. Plaintiff and Class members are entitled to a declaratory judgment that the Small Claims Provision is unenforceable and that they are entitled pursue their claims in this Court.

## CLASS ACTION ALLEGATIONS

224. Plaintiff brings this lawsuit as a class action under F.R.C.P. 23.

225. Plaintiff proposes the following Class, initially defined as follows:

> **Nationwide Class**: All natural persons in the United States who, within the applicable statute of limitations (the "Class Period"), paid for Adobe subscriptions.

226. Excluded from each Class are: (1) Adobe, any entity or division in which Adobe has a controlling interest, and its legal representatives, officers, directors, assigns, and successors; (2) the judicial officers and their immediate family members and associated court staff assigned to this case; (3) Plaintiff's counsel, staff, and their immediate family members; and (4) any experts or consultants Plaintiff retains to work on this matter.

227. Plaintiff reserves the right to re-define any of the class definitions prior to class certification and after having the opportunity to conduct discovery.

228. The claims of all Class members derive directly from a single course of conduct by Adobe. Adobe has engaged and continues to engage in uniform and standardized conduct toward the

Class members.

229.    Certification of Plaintiff's claims is appropriate because Plaintiff can prove the elements of Plaintiff's claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

230.    Accordingly, Plaintiff brings this lawsuit as a class action on Plaintiff's own behalf and on behalf of all other business, entities, and individuals similarly situated pursuant under Fed. R. Civ. P. 23. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of these provisions.

231.    Specifically, this action has been properly brought and may properly be maintained as a class action under Rule 23(a)(1-4), Rule 23(b)(1), (2), or (3), and/or Rule 23(c)(4) of the Federal Rules of Civil Procedure.

232.    **Numerosity** (Fed. R. Civ. P. 23(a)(1)): The members of the proposed Class are so numerous that their individual joinder would be impracticable. While the exact number is not known at this time, it is generally ascertainable by appropriate discovery, and it is believed the class includes hundreds of members.

233.    **Commonality and Predominance** (Fed. R. Civ. P. 23(a)(2); 23(b)(3)): Common questions of law and fact exist as to all Class members. These questions predominate over the questions affecting only individual Class members. The common legal and factual questions include, without limitation:

a)    Whether Adobe failed to present the automatic renewal or continuous service offer terms in a clear and conspicuous manner, and in visual proximity to the request for consent to the offer, prior to completion of the purchase, in violation of Cal. Bus. & Prof. Code § 17602(a)(1);

b)    Whether Adobe charged Plaintiff's and Class members' Payment Methods for an automatic renewal or continuous service without first obtaining affirmative consent to the relevant offer terms, in violation of Cal. Bus. & Prof. Code § 17602(a)(2);

c)    Whether Adobe failed to provide an acknowledgment that included the automatic renewal or continuous service offer terms, the applicable cancellation policy, and information on

how to cancel in a manner capable of being retained by the consumer, in violation of Cal. Bus. & Prof. Code § 17602(a)(3);

d) Whether Adobe's Subscriptions constitute "automatic renewals" within the meaning of Cal. Bus. & Prof. Code § 17601(a);

e) Whether, as a result of Adobe's conduct, the goods and services provided must be deemed an "unconditional gift" under Cal. Bus. & Prof. Code § 17603;

f) Whether Adobe's conduct violates California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, *et seq.*; the Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq.*; the Automatic Renewal Law, Cal Bus. & Prof. Code §§ 17600, *et seq.*; and/or the Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*;

g) Whether Adobe's dispute resolution provisions are enforceable or whether Adobe has breached its agreement to arbitrate and/or waived its right to arbitrate;

h) Whether Plaintiff and Class members are entitled to restitution and/or damages as a result of Adobe's conduct;

i) Whether Adobe should be enjoined from continuing the misconduct alleged herein;

j) Whether Plaintiff and Class members are entitled to attorneys' fees and costs under California Code of Civil Procedure § 1021.5.

k) Whether Plaintiff and Class members are entitled to relief under Cal. Business & Professional Code § 17200 *et seq*;

l) Whether Plaintiff and Class members are entitled to compensatory, punitive, and statutory damages; and

m) Whether Plaintiff and Class members are entitled to attorney fees and costs.

234.    **Typicality of Claims** (Fed. R. Civ. P. 23(a)(3)): The claims of Plaintiff and the respective Class are based on the same legal theories and arise from the same unlawful and willful conduct of Adobe, resulting in the same injury to the Plaintiff and Class. Plaintiff and all Class members are similarly affected by Adobe's wrongful conduct and were damaged in the same way. Plaintiff's interests coincide with, and are not antagonistic to, those of the other Class members.

Plaintiff has been damaged by the same wrongdoing set forth in this Complaint.

235. **Adequacy of Representation** (Fed. R. Civ. P. 23(a)(4)): Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class members, and he has retained counsel competent and experienced in complex class actions, mass arbitrations, and consumer litigation. Plaintiff and his counsel will fairly and adequately protect the interest of the Class members.

236. **Superiority of a Class Action** (Fed. R. Civ. P. 23(b)(3)): A class action is superior to other available means for the fair and efficient adjudication of the claims of Plaintiff and Class members. There is no special interest in Class members individually controlling the prosecution of separate actions. The damages suffered by individual Class members, while significant, are small given the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Adobe's conduct. Further, it would be virtually impossible for the Class members individually to redress effectively the wrongs done to them. And, even if Class members themselves could afford such individual litigation, the court system could not, given the thousands of cases that would need to be filed. Individualized litigation would increase the delay and expense to all parties and the court system, given the complex legal and factual issues involved. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

237. **Appropriateness of Final Injunctive or Declaratory Relief** (Fed. R. Civ. P. 23(b)(2)): In the alternative, this action may properly be maintained as a class action, because:

   a) the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudication with respect to individual Class members, which would establish incompatible standards of conduct for Adobe; or

   b) the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to individual Class members which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; or

c) Adobe has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Class as a whole.

238.  **Superiority** (Fed. R. Civ. P. 23(b)(3)): A class action is a superior method for the fair and efficient adjudication of this controversy because:

a) Class-wide damages are essential to induce Adobe to comply with the law.

b) Because of the relatively small size of the individual Class members' claims, it is likely that only a few Class members could afford to seek legal redress for Adobe's misconduct.

c) Management of these claims is likely to present significantly fewer difficulties than those presented in many class claims.

d) Absent a class action, most Class members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law.

e) Class action treatment is manageable because it will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender.

f) Absent a class action, Class members will continue to incur damages, and Adobe's misconduct will continue without remedy.

**CALIFORNIA LAW APPLIES TO PLAINTIFF AND THE ENTIRE CLASS**

239.  California's substantive laws apply to every class member, regardless of where in the United States the class member resides.

240.  California's substantive laws may be constitutionally applied to the claims of Plaintiff and the class members under the Due Process Clause, 14th Amend. §1, and the Full Faith and Credit Clause, Art. IV §1 of the U.S. Constitution. California has significant contacts, and a significant aggregation of contacts, with the claims asserted by Plaintiff and all class members, creating state interests such that the choice of California state law is not arbitrary or unfair.

241.  Adobe's terms mandate the application of California law to these claims "without regard to conflict of law rules."

242.    Adobe's United States headquarters and principal place of business is located in California. Therefore, California has an interest in regulating Adobe's conduct under its laws. Adobe's decision to reside in California and avail itself of California's laws, and to engage in the challenged conduct from and emanating out of California, renders the application of California law to the claims here constitutionally permissible.

243.    Upon information and belief, California is the state from which Adobe's alleged misconduct and false statements emanated. This conduct similarly injured and affected Plaintiff and all other class members.

244.    The application of California laws to the class members is also appropriate under California's choice of law rules because California has significant contacts to the claims of Plaintiff and the proposed Class, and California has a greater interest in applying its laws here than any other interested state.

## COUNT I
### DECLARATORY JUDGMENT

245.    Plaintiff incorporates by reference each of the allegations contained in the preceding and following paragraphs of this Complaint and further alleges as follows.

246.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Adobe.

247.    Adobe purports to retain the right to unilaterally refuse to arbitrate and to force consumers into small claims court. Indeed, Adobe refused to arbitrate Plaintiff's claims (along with many others' claims) and seeks to force Plaintiff into small claims court.

248.    In many states, including in California, individuals in small claims court are not entitled to counsel, discovery, or appeal, among other rights.

249.    Contractual provisions dictating how disputes may be resolved must provide a party with an adequate forum to vindicate rights.

250.    Such provisions must also meet minimum fairness requirements, including that the provision is not overly one-sided or denies important procedural protections.

251.    Adobe's Small Claims Provision purports to allow Adobe to force Plaintiff and Class

members to bring their claims in small claims court at Adobe's choice.

252.    Furthermore, the Terms of Use provide no notice that consumers waive such rights if Adobe forces a claimant into small claims court.

253.    When dispute resolution provisions are not fair and do not provide an adequate forum for the consumer to vindicate their rights, the provisions are unconscionable and unenforceable.

254.    Based on the facts alleged above, Plaintiff and Class members seek a declaratory judgment that the Small Claims Provision is unconscionable and unenforceable, that Adobe's terms do not contain an agreement to settle a dispute by arbitration within the meaning of the FAA, and that Adobe has breached its agreement to arbitrate with Plaintiff and the Class members or has otherwise waived its right to arbitrate.

## COUNT II
### VIOLATION OF CALIFORNIA CONSUMER LEGAL REMEDIES ACT
### Cal. Civ. Code §§ 1750, *et seq.*

255.    Plaintiff incorporates by reference each of the allegations contained in the preceding and following paragraphs of this Complaint and further alleges as follows.

256.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Adobe.

257.    Plaintiff and Class members are "consumers" as defined by California Civil Code § 1761(d), in that they sought or acquired Adobe's goods and/or services for personal, family, or household purposes.

258.    Adobe's subscription offerings—including the Adobe subscriptions—and related products are "goods" and/or "services" within the meaning of Cal. Civil Code § 1761(a) and (b). The transactions entered into by Plaintiff and the Class to obtain those subscriptions constitute "transactions" under Civil Code § 1761(e).

259.    Adobe engaged in uniform acts and practices that were designed to mislead and deceive consumers in connection with those transactions. These acts and practices have resulted, and continue to result, in financial injury to Plaintiff and the Class.

260.    Adobe's conduct violates the CLRA in at least the following respects:

- Adobe misrepresented, and/or omitted material facts about, the characteristics, uses, or

benefits of the Adobe subscriptions, in violation of § 1770(a)(5);

- Adobe advertised its subscription offerings without the intent to sell them as advertised, in violation of § 1770(a)(9);

- Adobe represented that subscription transactions confer or involves rights, remedies, or obligations that they do not have or involve, or that are prohibited by law in violation of § 1770(a)(14); and/or

- Adobe inserted unconscionable provisions in consumers' terms in violation of § 1770(a)(19).

261.    Plaintiff and the Class were economically harmed as a direct result of Adobe's conduct. They were induced to purchase, and in many cases to continue paying for, Adobe subscriptions under materially false pretenses. Had the true terms of those subscriptions—including the cancellation and renewal provisions—been fully and clearly disclosed, Plaintiff and Class members would not have subscribed, or would have canceled their subscriptions earlier than they did.

262.    Plaintiff, on behalf of himself and the Class, seeks injunctive relief to bar Adobe from continuing its unlawful practices in violation of the CLRA. Adobe's ongoing omissions and misrepresentations remain likely to deceive a reasonable consumer.

263.    Consistent with the requirements of Civil Code § 1782, Plaintiff provided Adobe with written notice of their claims on October 1, 2024. The notice letter, sent via certified mail with return receipt requested, advised Adobe that it was in violation of the CLRA and demanded that it rectify the violations.

264.    Adobe failed to take corrective action in response to that notice. Adobe did not remedy the violations described, nor did it offer to provide meaningful restitution.

265.    Pursuant to Cal. Civil Code § 1780, Plaintiff, on behalf of himself and the Class, seeks the following relief: (a) Actual damages, in an amount to be determined at trial; (b) An order enjoining Adobe from continuing its unlawful practices; (c) Restitution of all money or property lost as a result of Adobe's conduct; (d) Punitive damages; (e) Any other relief the Court deems just and proper; and (f) An award of attorneys' fees and costs.

### COUNT III
### VIOLATION OF CALIFORNIA FALSE ADVERTISING LAW

**Cal. Bus. & Prof. Code §§ 17500, *et seq.***

266.    Plaintiff incorporates by reference each of the allegations contained in the preceding and following paragraphs of this Complaint and further alleges as follows.

267.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Adobe.

268.    California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.*, prohibits any person or entity from making or disseminating, or causing to be made or disseminated, any statement concerning their products or services "which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading" or to plan to not sell the advertised product or services "at the price stated therein, or as so advertised." This prohibition applies to any such communication made "before the public in this state," in "any advertising device," "or in any other manner or means whatever, including over the Internet."

269.    Adobe has repeatedly and intentionally made statements to consumers and the general public that misrepresent, conceal, or omit material facts regarding the terms and nature of its Adobe subscriptions. These false and misleading statements concern the scope and application of Adobe's cancellation policies, automatic renewal practices, and related payment terms. Further, Adobe advertised prices for its subscriptions that did not truthfully show the full price Adobe planned to charge. Adobe knew, or by the exercise of reasonable care should have known, that its advertising was deceptive both on its face and by omission.

270.    In particular, Adobe has failed to disclose key terms of the subscriptions and their cancellation policies—such as the contract length, the difficulty of cancellation, the imposition of termination fees, or limitations on timing—either before or after enrollment in the Adobe subscriptions. The Subscription Flow, including the Checkout Page, are silent on these critical terms, and that silence renders the materials false and deceptive within the meaning of the statute. Adobe made these misrepresentations and omissions as part of a broader scheme to induce enrollment while avoiding transparency about the actual costs and restrictions associated with its services.

271.    Plaintiff and Class members reasonably relied on these representations and omissions in deciding to enroll. They were led to believe that the subscription terms were straightforward and

cancellation would be simple. In reality, Adobe's true policies were only revealed after Plaintiff had already begun paying for the subscriptions—by which time they were locked into recurring charges they did not knowingly agree to. Any reasonable consumer would have been similarly misled.

272.    These misrepresented and omitted facts are material because a reasonable consumer would rely on them in deciding to purchase an Adobe subscription. The true terms of the Adobe subscriptions, including the contract length, price, cancellation terms, and termination fees, would have been an important factor in Plaintiff's and Class members' purchasing decisions.

273.    As a result of Adobe's deceptive conduct, Plaintiff and the Class suffered actual economic injury. They paid for subscription services under materially false pretenses and would not have made those purchases—or would not have agreed to the same terms—had Adobe accurately disclosed its subscription terms. The Adobe subscriptions lacked the characteristics and functionality as advertised.

274.    The conduct described herein is precisely the type of deceptive advertising the California Legislature sought to prohibit. Adobe's false and misleading statements, omissions, and concealments were likely to deceive the public, and in fact did deceive Plaintiff and other Class members. There is a strong probability that other consumers were likewise misled and continue to be exposed to Adobe's ongoing misconduct.

275.    Accordingly, Plaintiff, on behalf of himself and all similarly situated consumers, seek relief under the False Advertising Law, including an order enjoining Adobe from continuing to make or disseminate false or misleading advertising materials; restitution to restore all money wrongfully obtained; disgorgement of Adobe's profits derived from its deceptive conduct; and an award of reasonable attorneys' fees and costs.

## COUNT IV

### VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW
### Cal. Bus. & Prof. Code §§ 17200, *et seq.*

276.    Plaintiff incorporates by reference each of the allegations contained in the preceding and following paragraphs of this Complaint and further alleges as follows.

277.    Plaintiff brings this claim individually and on behalf of the members of the proposed

Class against Adobe.

278.    The UCL prohibits unfair competition, including any unlawful, unfair, or fraudulent business practices and misleading advertising. Cal. Bus. & Prof. Code § 17200. It permits individuals who have suffered injury and lost money or property to file a civil action for UCL violations. Cal. Bus. & Prof. Code § 17204. Such persons can also represent others similarly affected by the unfair practices.

279.    Adobe falsely advertised the price and terms of the subscriptions and unfairly and fraudulently failed to disclose the terms of the subscriptions, including the termination fees, to subscription purchasers such as Plaintiff and Class members.

280.    Further, Adobe's ABM subscription locks users into a year-long contract, and if a user cancels before the end of the term, they are charged a high early termination fee (often 50% of the remaining contract balance). This is an unfair business practice under the UCL because it penalizes consumers for attempting to leave a service they no longer want or need. The penalty is excessive and disproportionate, especially because it was not clearly disclosed when consumers signed up.

281.    By advertising the ABM service as a "monthly" payment, Adobe creates the impression that consumers can cancel at any time. However, undisclosed terms lock them into an annual agreement, with severe financial penalties for early termination. This imbalance between the consumer's reasonable expectations and the company's actions is unfair under the UCL.

282.    Overall, Adobe's acts, omissions, nondisclosures, and misleading statements, as alleged herein, were false, misleading, and/or likely to deceive reasonable consumers. Adobe knew or should have known such practices would induce reliance and harm Plaintiff and Class members.

283.    Additionally, all products received from Adobe in violation of the ARL are considered "unconditional gifts" under Cal. Bus. Prof. Code § 17603. And Adobe has not complied with the provisions of the ARL in good faith. Thus, Adobe is in improper possession of property and/or funds paid by Plaintiff and Class members for Adobe subscriptions, and has converted to Adobe's own use and benefit money that rightfully belongs to Plaintiff and the Class.

284.    In addition to these independent violations of the UCL, Adobe committed unlawful and unfair business practices under the UCL by violating the ARL, CLRA, and FAL, as described herein.

285.    Reasonably available alternatives existed that would have allowed Adobe to further its

legitimate business interests without engaging in the conduct described herein.

286.     Plaintiff and Class members suffered substantial injury and monetary loss as a result of Adobe's unfair and unlawful conduct. Had Adobe complied with its disclosure obligations under the ALR and refrained from engaging in deceptive practices, Plaintiff and Class members would not have purchased Adobe subscriptions or would have canceled them before renewal to avoid additional charges. As a result, Plaintiff and the Class sustained economic harm directly and proximately caused by Adobe's conduct.

287.     Adobe's violations are ongoing and continue to cause harm to the public and members of the Class. Adobe has not ceased its unlawful practices related to the Adobe subscriptions, and consumers remain exposed to the same misleading and unfair business conduct.

288.     Plaintiff, on behalf of himself and similarly situated individuals, seeks equitable relief, including restitution of the amounts paid to Adobe as a result of its unlawful conduct. Pursuant to California Business and Professions Code § 17203, Plaintiff requests an order requiring Adobe to: (a) provide restitution to Plaintiff and Class members; (b) disgorge all revenues obtained through its violations of the UCL; and (c) pay attorneys' fees and costs incurred by Plaintiff and Class members.

289.     Plaintiff further seeks injunctive relief to prohibit Adobe from continuing to engage in the deceptive and unlawful practices alleged herein. This includes requiring Adobe to either clearly and conspicuously disclose the full terms of its subscription offers or to remove misleading design elements from its Subscription Flow. Unless restrained by Court order, Adobe's conduct is likely to continue, causing ongoing harm to consumers and violations of California law.

290.     Absent injunctive relief, current and future consumers will be forced to seek repeated legal remedies to recover payments made to Adobe under misleading or noncompliant subscription terms. Plaintiff and similarly situated individuals have no adequate remedy at law to ensure Adobe's future compliance with California's consumer protection statutes.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment on behalf of himself and the Class as follows:

A.     certifying the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiff as representative of the Class, and designating Plaintiff's counsel as Class Counsel;

B.     for declaratory judgment that the Small Claims Provision is unenforceable and that Adobe has breached its agreement to arbitrate, waived its right to arbitrate, and that Adobe's terms do not contain an arbitration clause within the meaning of the FAA;

C.     awarding Plaintiff and the Class compensatory damages and actual damages, to be determined by proof;

D.     for punitive damages;

E.     for civil penalties;

F.     for injunctive relief;

G.     for declaratory and equitable relief, including restitution and disgorgement;

H.     awarding Plaintiff and Class members the costs of prosecuting this action;

I.     awarding Plaintiff and Class members reasonable attorneys' fees and costs as allowable by law;

J.     awarding pre-judgment and post-judgment interest; and

K.     granting any other relief as this Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury for all claims so triable.

Respectfully submitted,

Dated: October 27, 2025October 27, 2025

**BATHAEE DUNNE LLP**

By: */s/ Andrew C. Wolinsky*
Andrew C. Wolinsky (CA 345965)
awolinsky@bathaeedunne.com
Yavar Bathaee (CA 282388)
yavar@bathaeedunne.com
Bryce W. Talbot (*pro hac vice* forthcoming)

56

*Foret v. Adobe Inc.* - Class Action Complaint

btalbot@bathaeedunne.com
445 Park Avenue, 9th Floor
New York, NY 10022
Tel.: (332) 322-8835

Allison Watson (CA 328596)
awatson@bathaeedunne.com
3420 Bristol Street, Suite 600
Costa Mesa, CA 92626
Tel.: (213) 458-7075

**JANOVE PLLC**
Raphael Janove (CA 361193)
500 7th Ave., 8th Fl.
New York, NY 10018
(646) 347-3940
raphael@janove.law


*Attorneys for Plaintiff and the Proposed Class*

*Foret v. Adobe Inc.* - Class Action Complaint